Ray MARSHALL, Secretary of Labor,
United States Department of
Labor, Plaintiff,

v.

SAM DELL'S DODGE CORP., Sam R. Dell, Sr., Individually and as President and Treasurer, Sam R. Dell, Jr., Individually and as Secretary, Defendants.

No. 76–CV–258.

United States District Court,
N. D. New York.

May 18, 1978.

---

PORT, Senior District Judge.

## MEMORANDUM–DECISION AND ORDER

### I. NATURE OF THE PROCEEDING

This action was brought by the Secretary of Labor to enjoin defendants from violating minimum wage and record-keeping requirements of the Fair Labor Standards Act, 29 U.S.C. §§ 201–19 (the Act), and to obtain back wages on behalf of numerous employees of defendants.

More specifically, the complaint, filed on June 21, 1976, charges that defendants violated sections 6 and 15(a)(2) of the Act (29 U.S.C. §§ 206, 215(a)(2)) by failing to pay car salespersons the applicable minimum wage for each week of work, and also violated sections 11(c) and 15(a)(5) of the Act (29 U.S.C. §§ 211(c), 215(a)(5)) by failing to deep adequate and accurate records of the hours worked by these salespeople. The case was tried to the court on November 17 and 18, 1977. After obtaining the transcript of the trial, the parties have briefed the matter and it is now before me for decision.

### II. ISSUES

Jurisdiction over the parties and subject matter and all statutory requirements for coverage under the Act were stipulated. The issues framed by the pretrial order are:

A. Does a two or three year statute of limitations apply to this case?

B. How many hours did each employee whose wages are at issue work during each of the periods in question?

C. What were the amounts which each employee should have been paid in compliance with the minimum wage provisions of the Act?

D. To what relief, if any, is the plaintiff entitled?

The findings and conclusions with reference to each of the issues are as follows:

A. The three year statute of limitations applies.

B. With the three exceptions noted hereinafter, each employee worked

Carin Ann Clauss, Sol. of Labor, Francis V. La Ruffa, Regional Sol., New York City, for plaintiff U. S. Dept. of Labor; Diane J. Zwerling, Massapequa, N. Y., of counsel.

F. Timothy Keough, Syracuse, N. Y., Carrigan & Keough, Syracuse, N. Y., for defendants.

55 hours per week prior to January 1, 1976.

C. Each employee should have been paid, for each week, the applicable minimum wage times the number of hours hereinafter found to have been worked.

D. Plaintiff is entitled to the relief requested in its complaint.

### III. FINDINGS OF FACT

Defendant Sam Dell's Dodge Corp. is an automobile dealership in Syracuse, New York. Defendants Sam Dell, Sr. and Sam Dell, Jr. have acted directly in the interest of defendant Sam Dell's Dodge Corp. in relation to its employees and, therefore, all three defendants are employers within the meaning of section 3(d) of the Act, 29 U.S.C. § 203(d). Defendants' activities have been performed through a unified operation for a common business purpose, thus constituting an enterprise under section 3(r) of the Act, 29 U.S.C. § 203(r). They are an enterprise engaged in commerce or in the production of goods for commerce. 29 U.S.C. § 203(s). (Tr. 5).

The hours and wages of 117 salespersons who were employed at Sam Dell's Dodge at some time between June 21, 1973 and the date of trial are at issue. (Tr. 5).[1] Aside from their major responsibility for selling vehicles (Tr. 15, 16), they would obtain license plates from the Department of Motor Vehicles, occasionally pick up insurance cards for their customers, and touch up the cars prior to delivery to the customers. (Tr. 57). Additional duties included starting up cars on the lot in the morning, moving these cars around when necessary during the day, and removing the keys at night. (Tr. 85). The salespeople worked in any or all of defendants' new car, used car and truck departments.

The defendants paid their salespeople under a series of rather complex plans. Total compensation included combinations of base pay, commissions, and bonuses. These plans were all introduced into evidence as defendants' Exhibits C–K. The plans varied from time to time but can be summarized as follows. Each salesperson received base pay of $56.00 per week for most of the period covered by this action. The base pay was received free and clear without regard to sales made. Commissions were paid on the sales of just about everything, new cars, used cars, trucks, accessories and finance agreements. At times the commissions were fixed amounts paid for the sale of each new car. (See Defendants' Exhibit H). For used cars and, more recently, for new cars the commissions were a percentage of either the sales price or the dealer's profits. On top of commissions, salespersons were paid bonuses as an incentive for increased sales. For selling four or more cars during one week, a salesperson would receive a weekly bonus in the next pay check. If he or she sold over 20 cars during one month, a monthly bonus would be received at the end of that month. Similarly, annual bonuses were paid for the sale of over a given number of cars during a calendar year. For a good salesperson, these bonuses could be substantial compared to the base pay. (Tr. 249).

Some salesmen testified, however, that they would stagger receipt of their commissions so as to spread out or average their income during the year. (Tr. 123). In this way, they would not get a disproportionately large pay check after a highly successful selling week. Nevertheless, there were some weeks during each year when each salesperson received only the base salary— $56.00 prior to 1976 (see plaintiff's Exhibit 11(a))—and failed to earn any commissions or bonuses.

Many of the salespeople were furnished by defendants with demonstrator cars or "demos." Primarily, these cars were used in connection with the salespersons' duties at Sam Dell's Dodge Corp. The cars were parked on the lot during the day. (Tr. 80–81). Salespeople used them for demon-

---

1. The names, periods of employment, and wages earned by these 117 salespersons are listed in Defendants' Exhibit A.

stration rides for their customers. Occasionally, the "demos" would be lent to other salespeople for the same use. (Tr. 157). Salespersons were permitted to drive the cars for personal use when not working; however, they were specifically told that the cars were not for their families. (Tr. 80, 156). For each week that a "demo" was provided to an employee, defendants deducted $2.50 from that employee's earnings for insurance. The value of the use of the "demos" was never included on the employee's W–2 tax statements or the employer's pay records. (Tr. 81). After April, 1976, defendants' pay plans indicated that a Form 1099 would be given to each employee listing the value of the "demo" car at $20.00 each month. (See defendants' Exhibits D, J, K). However, defendants failed to introduce any evidence that the 1099 Forms were ever provided.

The bulk of the testimony received at trial concerned the number of hours worked each week by the sales staff. Defendants' showroom and car lots, referred to throughout the trial as the "store" were open six days a week. On Mondays, Tuesdays and Thursdays, the store was open from 9:00 A.M. to 9:30 P.M. Wednesdays, Fridays and Saturdays the store was open from 9:00 A.M. to 6:30 P.M. (Tr. 16, 58, 85, 222). Thus, defendants' posted operating time for the store totaled 66 hours per week. The operating hours did not change during any of the time which is the subject of this suit. The hours were the same year-round, during the slow season as well as the busy season. (Tr. 22, 164).

Some of the witnesses testified that on occasion, some salespeople arrived to work late. (Tr. 75). However, sales meetings were held four days a week—Mondays, Wednesdays and Fridays at 9:00 A.M. and on Saturdays at 8:50 A.M. Considering that all salespersons were required to attend these meetings, (Tr. 89), which occurred on two-thirds of the working days,

and also considering that the entire sales staff reported for work early on Saturday, the tardiness averaged over the entire staff for the entire year would be negligible.

Similar testimony was introduced to show that either the store closed early on occasion or that salespersons left a few minutes before closing. Russell Will testified that on long days, if business was slow, he would leave thirty minutes early. (Tr. 16). Gary Demperio stated that he left about one-half hour early approximately half the time, (Tr. 58), and that other salespersons might go home fifteen to thirty minutes early. On rare occasions, the store would close in the evening due to a snow storm. However, Victor Samora testified that when he worked on the used car lot, he never left before 9:30 P.M. (Tr. 104). James Cannady, who became defendants' new car manager in 1974, testified that the store closed early anywhere between fifteen and sixty minutes, about 50% of the time. This informal policy of early closing or early departure of salespersons reduced the average work week by one and one-half hours.[2]

A great deal of conflicting testimony was introduced concerning defendants' day-off policy. According to Cannady, former new car manager, defendants scheduled specific days off for the sales staff. Until some time in 1974, each salesperson was given a half day off each week and, thereafter, received a full day off. However, almost without exception, the witnesses testified that they rarely, if ever, took the time off. Some never took the day off. (Tr. 21, 43). Some took part of a day off during the slow time, (Tr. 116), or perhaps during the summer. (Tr. 59). Generally, most salespeople wanted to maximize their work so as not to lose customers and, therefore, did not stay away from the store on their days off. (Tr. 356). Furthermore, even on days off, salespeople were required to attend sales meetings. After the meetings, even if they in-

---

2. The truck department regularly closed at 9 P.M. on long days. (Tr. 109). Since there were three long days each workweek, truck salesmen would work one and one-half hours less than the posted operating hours for the store.

This is an amount equal to the average early closing or departure time for car salespeople. Thus, employees in the truck department worked the same average hours as those in the car department.

tended to take time off, they would first spend time at the store cleaning up paper work or doing business errands. (Tr. 134). Defendants' policies support a finding that time off was minimized by the sales staff. Although a regular day off would mean a five day workweek for the employees, they were docked one-sixth of their base pay for missing a day's work without permission. (Tr. 10). Most significantly, defendants actively discouraged the sales staff from taking their days off, (Tr. 136), both individually and at sales meetings. (Tr. 168). The day-off policy reduced the average workweek by not more than one and one-half hours per week.[3]

Obviously, the employees took time each day for meals, including a dinner meal on the long days. Again, though, the testimony was conflicting as to the precise amount of time taken. All the testimony was in agreement that the duration of mealtime varied with the volume of business. During the busy seasons, a salesperson's lunch or dinner would regularly be shorter than during the quiet periods. (See, e. g., Tr. 17, 228). Furthermore, during the busy time an employee's meal might be interrupted by the arrival of customers at the store.

Most employees conceded that during the slow season the lunch hour would be a full hour. When the store was busy, however, employees might not take any time, (Tr. 16, 113), although most testified that they took at least a minimal amount of time, perhaps ten or fifteen minutes. (Tr. 60, 113, 132). Defendants' policy allowed for a full hour for lunch, (Tr. 228), but past managers conceded that this full lunch time was not taken during the busy season. (Id.). Two witnesses testified that the average time for lunch was one hour. (Tr. 232, 259). These estimates were in excess of those made by all the plaintiff's witnesses. Cross-examination developed that these witnesses were now working for another Dodge dealership owned in part and man-

aged by defendant Sam Dell, Sr. The interest of these witnesses, and also the plaintiff's witnesses who would benefit from a recovery has been considered in weighing the testimony of each. Whenever there were customers in the store, defendants encouraged the employees to be on the floor where they would have the opportunity to make sales. The lunch time taken by the employees, averaged over the course of the year, consumed 40 minutes per day per employee. Since the employees usually worked six day weeks, the total time for lunch each week equaled four hours.

The testimony revealed a similar pattern for the dinner hour. Some employees went out for the meal, taking between 30 and 60 minutes. (Tr. 61, 107, 114, 133). Other employees usually ate at the store, for example, after one of them went out and bought sandwiches for those who remained behind. (Tr. 17, 263). The average time taken for dinner was 40 minutes per day. Since employees usually worked three long days each week, an additional two hours each week was spent by each employee for dinner.

All employees testified that they took time out on occasion for personal errands. Russell Will admitted that when business was slow, he might balance his checkbook while sitting at his desk. (Tr. 34). Will and other salespersons stated that they would occasionally take time away from the store for personal business. For example, when a salesman needed to pick up license plates at the Department of Motor Vehicles, he might run an errand on the way. (Tr. 19). Will estimated that this happened only twice each month. (Id.). It was estimated that such a diversion on the way to the Department of Motor Vehicles would add 15 to 20 minutes to the length of that trip. (Tr. 162). Other witnesses testified that they took their personal time on lunch hour. (Tr. 61, 104, 162).[4]

---

3. One employee, Louis Gorney, testified that he regularly took a half-day off, or left the store on his day off after the sales meeting. (Tr. 107–08). The Court finds that Gorney worked, on the average two and one-half hours less than other employees each week.

4. Anita Mondore testified that she took a considerable amount of personal time each day—

Additionally, all employees took short breaks for coffee or juice. They would drink coffee downstairs in the cafeteria, or bring it back to the floor of the showroom. (Tr. 18, 54). Regardless of where they drank the coffee, the salespersons were always on call, and were ready to return to the showroom when a customer arrived. (Tr. 88). This frequently occurred. James Cannady, past manager, testified that salespersons drank coffee for an hour each day, but the court finds that most salespersons did not take that much time for a break [5] and that during most of their breaks, they were on call.

The court concludes that the total time spent by each salesperson for personal time away from the store and for breaks at the store when they were not on call reduced the workweek, on the average, by two hours.[6] Thus, the average workweek for defendants' salespersons, between June 21, 1973 and January 1, 1976 was 55 hours. The store was open 66 hours each week but eliminating 1½ hours each for early departure and the irregular day off practice (*see supra* at 297), four hours for lunch (*see supra* at 298), two for dinner (*Id.*), and another two for personal time leaves a 55 hour workweek.[7]

This is not a precise figure. It is my inference based on the evidence I regarded as credible. The deductions from the scheduled workweek are probably generous to the defendants; certainly they cannot be considered niggardly toward an employer whose deliberately contrived time records made precision impossible.

The parties have stipulated that, after January 1, 1976, the employees worked a 48 hour workweek.

One further fact must be considered when figuring the amount of time worked by defendants' sales staff. Defendants gave employees one week of paid vacation each year, after they had worked at Sam Dell's Dodge for a full year. (*See* Defendants' Exhibits C–K). Some witnesses testified to having taken these vacations. (Tr. 67, 110). Thus, in calendar years after an employee had already accumulated one year's experience with defendants, he might have one week where he received his base pay, although he was not actually working.

---

three hours per day for meals, breaks, and personal errands. (Tr. 87). However, she had earlier told the Department of Labor that she took only three hours of personal time each week, mainly on her lunch hour. (Tr. 356). Mondore presently works for a car dealership owned in part by the defendant, Sam Dell, Sr. In spite of this, since any exaggeration would be adverse to her pecuniary interest, her estimate of three hours per day is accepted. I find her workweek to have been 48 hours.

5. Cannady now works at the other Dodge dealership owned in part by the defendant, Sam Dell, Sr. *See* note 4 *supra.*

6. Testimony indicated that one employee, Nancy Mantz, took an excessive amount of personal time. She admitted that she occasionally had to leave the store to get a babysitter, or to take her child from the sitter to her home. (Tr. 144). Other witnesses testified to the same. (Tr. 235, 268). I find that Nancy Mantz took an average of two hours more personal time each week than the other employees.

Mantz' second child was born on April 28, 1974, causing Mantz to be out of work for several weeks. Mantz' pay records (Defendants' Exhibit A–72) are more reliable than her vague testimony concerning what happened at this time. Based on the pay records, I find that

Mantz did not work at all during the weeks dated April 23, April 30, May 7, May 14, and May 21, 1974. During the week dated May 28, 1974, I find that Mantz worked one day, nine hours.

When Mantz returned to work following the birth of this child, she obtained permission to come to work at 10:00 A.M. for health reasons. (Tr. 145). Therefore, I find that, during the week of June 4, she worked six fewer hours, or a total of 47 hours. Her testimony was vague concerning the length of time during which she came to work late. Since she earned in excess of the minimum wage in all these following weeks, however, it is unnecessary to make more specific findings.

7. Not every employee testified, but Department of Labor wage-hour investigator Welch testified that his investigation revealed a pattern of long hours worked by the employees. Welch estimated the workweek to be 60 to 65 hours long. Although the court differs with this precise figure, it accepts Welch's testimony that there was a pattern of long hours worked by all salespersons. By extrapolating from the testimony of the salespersons called at the trial, the court finds that all the sales staff worked 55 hours per week, except as specifically otherwise noted.

Despite the fact that defendants encouraged their employees to work long hours, defendants kept time records which grossly understated the number of hours actually worked. While the sales staff was working, on the average, a 55 hour or more week, defendants required their employees to sign time slips which purported to show that the employees were working only 36 hours per week. (Tr. 24, 67–8, 95–6, 111, 121, 141, 169; Plaintiff's Exhibits 5–10). Pay checks were handed out weekly. Before an employee was given his check, he was given a time slip to sign. The time slips were all uniform. (*See* Plaintiff's Exhibits 5–10). They state that the employee worked only six hours each day, alternately in the morning or afternoon. Thus, the maximum number of hours worked which was listed on these time slips was 36 hours per week. The time slips were not filled in by the salespersons. (Tr. 67). In fact, an examination of the time slips in evidence reveals that all of them were filled out by one person. The salespersons who testified conceded that the slips were inaccurate. (Tr. 24, 67, 95, 111, 121, 141, 169). But the employees signed them because they were told to do so. (Tr. 95, 141, 259). The pay checks and time slips were handed out each week by one of the managers, including, on occasion, defendant Sam Dell, Jr. (Tr. 121). Whoever handed out the slips instructed the employees to sign them. Benjamin Laquidari, former sales manager of defendant Sam Dell's Dodge Corp., admitted that he handed the slips out to the sales staff, knowing that the employees were signing something false. (Tr. 331). There was no testimony linking defendant Sam Dell, Sr. directly to these pay slips. However, he did admit that his responsibilities at Sam Dell's Dodge included the day to day general oversight and management of all aspects of the dealership.

Defendants' comptroller, Robert Wayne, testified about the origin of the 36 hour time slips. (Tr. 123). According to Mr. Wayne, in the late 1960's, defendant's show rooms were open six nights a week. Thus, the sales staff worked a "split shift", six hours each day, alternately working mornings and then evenings. (*Id.*). Later, although the actual hours changed, the payroll clerk never changed the time slips. The prior practice remained in use until the problem was discovered in 1976. (Tr. 124). Although Mr. Wayne's testimony about the origin of the 36 hour week is believable, his explanation for the continued use of inaccurate time slips strains credulity. Defendant Sam Dell's Dodge is a successful auto dealership. Defendant Sam Dell, Sr. has been in the car business for almost 40 years, and has achieved some prominence in the industry. (Tr. 334–35). It is hard to imagine that a practice initiated in the 1960's stayed in motion simply of its own inertia for years after it became obsolete. Giving credibility to such slipshod management would do a disservice to the alert and aggressive organization of the defendants.

Furthermore, during this period when defendants so cavalierly maintained inaccurate time slips for their sales personnel, other time records were subjected to examination by the Department of Labor. An investigation in 1967 revealed that two employees were due back wages for overtime, that there was a record-keeping violation with respect to one employee, and, most significantly, that proper time records weren't being kept. A later investigation, conducted in 1970, revealed that $5,300 in back wages for overtime was due and, again, that the proper record-keeping of hours was lacking. The 1970 investigation was concluded by the execution of a consent decree signed by this court, enjoining defendants from future violations of the overtime provisions of the Act. Admittedly, the prior investigations did not turn up the precise violations which are the subject of this suit. Nor did the investigations reveal any violations with respect to defendants' sales personnel. Nevertheless, they certainly drew defendants' attention to the Fair Labor Standards Act and the need for proper record-keeping. Moreover, despite the prior investigations, the evidence fails to disclose that defendants sought the advice of counsel concerning the legality of their pay plans. (Tr. 320).

■ Defendants have stipulated that they did not keep accurate records of the hours worked by their salespersons. It is concluded that defendants have violated § 6 of the Act with respect to minimum wages.[8] The defendants' practice of knowingly maintaining inaccurate time records which greatly understated the number of hours worked by their sales personnel permits only one conclusion; *i. e.* the violations of the Act were willful.

## III. CONCLUSIONS OF LAW AND DISCUSSION

A. *The workweek is the relevant pay period.*

■ Defendants' salespersons worked on the average 55 hours per week. For weeks during which they made no sales and, therefore, earned no commissions or bonuses, they would receive only the base pay—e. g., $56 per week prior to 1976—which was less than the minimum wage. Plaintiff contends that, by not paying the guaranteed minimum wage for each hour worked in each week, defendants violated section 6 of the Act. Defendants concede that they paid their employees only $56 in some weeks and that simple multiplication of the required minimum wage times the hours worked in those weeks exceeds the amounts paid. They contend, however, that some period other than the week should be used in assessing compliance with the minimum wage requirements of the Act.

The defendants recognize that *Brennan v. Lauderdale Yacht Basin, Inc.,* 493 F.2d 188 (5th Cir. 1974), is not authority for their contention. Still, they claim that the direction to the lower court on remand to "adopt some 'reasonable and equitable method' to allocate the commission 'among workweeks of the period in proportion to the amount of commission actually earned or reasonably presumed to be earned each week'", *Id.* at 191, as provided in the regulations governing overtime pay, points the way for this court to adopt some alternative distribution of earnings. Defendants urge

that the earnings for the entire year, including base pay, commissions, and bonuses, be divided by the number of weeks worked to determine the weekly wage paid. It is against this benchmark that the defendants would measure any back pay due the employee. Alternatively, and as an argument against the grant of injunctive relief, defendants propose that, if total payments in any month exceed the minimum wage for the hours worked during that entire month, they be found in compliance with the Act, even though payments below the minimum were made in any of the weeks of that month.

Defendants' proposed application of *Lauderdale Yacht* is neither supported by that case nor by other statutory or decisional law. The employees involved in *Lauderdale Yacht* were yacht salesmen who worked *irregular hours* and were paid only *if* and *when* they sold a yacht. The district court, without examining anything other than the total amount received by the salesmen annually, found no violation of overtime or minimum wage because the annual amount received exceeded the amount that would be paid for a 40 hour week at minimum wage and the balance of the week at one and one-half times minimum. The Court of Appeals branded the district court's decision as a "misapplication of the law", *Id.* at 190, and remanded. It required the lower court to make findings including, if necessary, an allocation of the commissions paid by some "reasonable and equitable method . . . among workweeks of the period in proportion to the amount of commissions actually earned or reasonably presumed to be earned each week", *Id.* at 191, in accordance with the regulations issued pursuant to the overtime provisions of the Act.

The difficulty encountered in *Lauderdale Yacht* by reason of the lack of regularity in pay periods is not present in the instant case. There is no problem under the facts presented in this case of fixing the work period. The defendants herein established, by their own practice, the workweek as the

---

**8.** *See infra* at 303.

customary pay period. Their salespersons were paid each week for earnings which accrued during that week. While car sales may be seasonal, defendants' pay practice, unlike that in *Lauderdale Yacht*, was regular. Having established the week as the applicable pay period, defendants cannot now argue that any other time period measures compliance with the Act.

Further support for this conclusion comes from the Secretary's own interpretations of section 6 of the Act. "Section 6(b) of the Act . . . is applicable on a workweek basis and *requires payment* of the prescribed minimum wages to each employee who 'in any workweek' is employed in a covered enterprise." Wage-Hour Opinion Letter No. 125 (Aug. 14, 1962). Likewise, the Secretary's regulations implementing section 7 of the Act base compliance on the workweek. "The Act takes a single workweek as its standard and does not permit averaging of hours over two or more weeks." 29 C.F.R. § 778.104.[9] Clearly, the Secretary's interpretations of the Act, although not binding on the court, are entitled to great weight. *Skidmore v. Swift & Co.*, 323 U.S. 134, 139–40, 65 S.Ct. 161, 89 L.Ed. 124 (1944).

The Supreme Court has emphasized the importance of paying an employee's minimum wage on a weekly basis. In considering the rationale behind the liquidated damages provision of the Act, 29 U.S.C. § 216(b), the Court noted that

> failure to pay the statutory minimum on time may be . . . detrimental to maintenance of the minimum standard of living "necessary for health, efficiency and general well-being of workers" . . . . Employees receiving less than the statutory minimum are not likely to have sufficient resources to maintain their well-being and efficiency until such sums are paid at a future date.

*Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697, 707–08, 65 S.Ct. 895, 902, 89 L.Ed. 1296 (1945). The defendants may see this rationale as applicable only to workers with annual incomes in the minimum wage range. However, in the period with which we are dealing even the better paid salesman with a family would be hard pressed if he were obliged to suffer a few weeks at less than minimum wages. Plaintiff has shown that at least four of defendants' salesmen failed to receive the minimum wage during periods of nine to twelve consecutive weeks. (Plaintiff's Exhibit 4). This is the precise danger which the Fair Labor Standards Act sought to meet.

The cases that have addressed this issue have held that the operative time period for measuring compliance with the Act is the workweek. In a suit for overtime wages for employees, the employer argued that deficiencies in overtime during certain weeks were made up for by payments in excess of statutory requirements in other weeks. The Fourth Circuit rejected this argument for two reasons: "[T]he Act takes as its standard a single workweek consisting of seven consecutive days." *Roland Electrical Co. v. Black*, 163 F.2d 417, 421 (4th Cir. 1947), *cert. denied*, 333 U.S. 854, 68 S.Ct. 729, 92 L.Ed. 1135 (1948); also, a claim for unpaid wages under the Act arises immediately upon the employer's failure to pay, on the regular pay day, all wages which are due. *Id.*

The Second Circuit has, likewise, in *United States v. Klinghoffer Bros. Realty Corp.*, 285 F.2d 487 (2d Cir. 1960), indicated that the workweek is the applicable time period for calculating the minimum wage. Defendants were being prosecuted for alleged violations of the minimum wage and over-

---

**9.** This regulation is part of the Secretary's regulations concerning overtime compensation. *See* 29 C.F.R. §§ 778.0–778.603. The workweek is clearly the relevant time period for measuring overtime, since maximum hours are defined in relation to a single week. *See* 29 U.S.C. § 207(a). Arguably the significance of the workweek is not as strong in relation to minimum wage, as long as the employee ulti- mately receives minimum wage for the hours worked. However, since the courts have noted the importance of the workweek, even when calculating minimum wage, *see, e. g., Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296 (1945), the cited regulation is relevant to the case at bar. This conclusion is buttressed by defendants' own practice of paying their employees weekly.

time provisions of the Act. Defendants' employees had agreed to work extra hours and be paid at a later date for the extra work. Their regular pay exceeded the Act's minimum wage requirements, including payment for the extra hours worked. However, the government argued that the employees were receiving no pay at all for the extra hours, in violation of the Act, since their weekly pay did not increase during this time. The Court of Appeals rejected this argument and focused on the workweek as a whole.

If the total wage paid to each guard in this case during any given week is divided by the total time he worked that week, the resulting average hourly wage exceeds $1.00 for every week and every guard involved. We believe this is all that is necessary to meet the requirements of § 206(a). The Congressional purpose underlying that section was to guarantee a minimum livelihood to the employees covered by the Act. Payment at intervals shorter than weekly is unusual and is not necessary to enable the employees to meet their customary obligations. Accordingly the Congressional purpose is accomplished so long as the total weekly wage paid by an employer meets the minimum weekly requirements of the statute, such minimum weekly requirement being equal to the number of hours actually worked that week multiplied by the minimum hourly statutory requirement.

*United States v. Klinghoffer Bros. Realty Corp.*, 285 F.2d 487, 490 (2d Cir. 1960) (footnote omitted).

*Roland Electrical* and *Klinghoffer Bros.* were recently followed by a district court in a case involving car salesmen. The employees worked on a commission basis and the defendants argued that payments in excess of minimum wage during certain weeks offset deficiencies in other weeks, thus relieving the employers of liability under the Act. The court held that the Act requires computations of wages and hours on a weekly basis; employees must earn the minimum wages free and clear for each hour worked in that week. *Marshall v. Courtesy Motors,*

*Inc.*, 77–3027–28R (E.D.Va., filed Aug. 8, 1977) (copy annexed to plaintiff's post-trial brief).

In this case the relevant period for analyzing compliance with section 6 of the Act is the workweek. Regardless of the total pay received by an employee, the Act requires that each employee receive, each week, an amount equal to the minimum wage times the number of hours worked. Defendants have, therefore, violated section 6 of the Act by paying less than minimum wage to certain employees in certain weeks. However, because of the nature of defendants' pay plans, it is necessary to inquire whether compensation other than the weekly pay check can be allocated among the various workweeks.

## B. *Bonuses.*

In addition to their base salary and commissions, defendants' salespersons received weekly, monthly and annual bonuses. The bonuses served as an incentive plan for higher sales and were paid if a salesperson sold over a given number of vehicles during any week, month or year. The details were outlined in defendants' pay plans. *See* Defendants' Exhibit C–K. Weekly bonuses were paid for sale of four or more cars during the previous week and, therefore, require no special attention in analyzing defendants' compliance with the Act. But monthly and annual bonuses were paid at the end of a month or year, respectively, based on an employee's sales during that entire period.

As a practical matter, the application of the monthly and annual bonuses would have little or no impact on the degree of noncompliance with the minimum wage requirements. In all likelihood, during any month in which an employee has earned a bonus by virtue of car sales, his commissions would most likely have brought his weekly payment of wages above the minimum. The annual bonus spread out through the year conceivably could have some minimal effect. Seemingly, the parties have resolved the matter by their stipu-

lation that "[d]efendants' pay records establish actual pay for each work week for all times relevant to this litigation for all sales persons employed by defendants." (Tr. 6).

In any event, the payment of bonuses can only be considered in connection with the minimum wages for the week in which they are paid. Under the facts in this case, any other recognition of the bonus payments would obviously be a deferred payment of wages which could not be credited against the minimum wage requirement for any prior week. *See Roland Electrical Co. v. Black*, 163 F.2d 417, 421 (4th Cir. 1947), *cert. denied*, 333 U.S. 854, 68 S.Ct. 729, 92 L.Ed. 1135 (1948). That is not to say that circumstances other than these present here may not arise which would require different treatment.

### C. *Demonstrator cars.*

■ Although they did not argue the question in their briefs, defendants introduced evidence suggesting that they compensated their salespersons by providing them with demonstrator cars or "demos." The reasonable cost of facilities customarily furnished to employees may be considered part of their wages. 29 C.F.R. § 531.30. However, facilities which are "primarily for the benefit or convenience of the employer" do not qualify as wages. 29 C.F.R. § 531.-32(c).

Defendants' employees were given "demos" and were permitted to drive them for personal use when not working; their family members were forbidden from driving the cars. The evidence suggested that mileage accumulated by the salespeople when driving for personal use was not insignificant when compared with business use.[10] Nevertheless, it is plain that these "demos" were furnished primarily for the benefit of defendants. Clearly, the cars were valuable and necessary tools.

It is obvious that a salesman of an automobile should have an automobile in his possession at all times that would be one of those products that his employer was engaged in selling. The very nature of his duties as a car salesman would require his possession and use of an automobile, even on personal business, and that the business of his employer would suffer if this were not the case.

*Brennan v. Modern Chevrolet Co.*, 363 F.Supp. 327, 333 (N.D.Tex.1973), *aff'd*, 491 F.2d 1271 (5th Cir. 1974). Furthermore, neither defendants nor their employees treated the cars as wages. Although a sum was deducted from each pay check for insurance, the value of the use of the cars was not indicated on defendants' pay records. Nor did the W–2 tax statements reflect the value of the use of the "demos" furnished.

Two recent cases involving almost identical facts have concluded that demonstrator cars furnished to salespersons are not wages. In *Brennan v. Modern Chevrolet Co., Id.,* the district court conceded that personal use of the cars accounted for 90% of the mileage accumulated. Still, because of the primary benefit to the employer, the cars were not wages. *Id.* A similar conclusion was reached in *Marshall v. Courtesy Motors, Inc.,* 77–3027–28R (E.D.Va., filed Aug. 8, 1977) (copy annexed to plaintiff's post-trial brief). The reasoning of those two cases applies at least as strongly to the facts of the instant case. Under the circumstances, the value of the demonstrator cars cannot be counted as wages.

### D. *Willfulness.*

It is unnecessary to tarry over the issue of defendants' willfulness. (*See supra* at 300–301). Defendants' long-running falsification of time records, the prior investigations by the Department of Labor and defendants' failure to seek the advice of counsel concerning the legality of their pay

---

**10.** There was no specific evidence concerning the percentage of time or mileage devoted to personal versus business use. The testimony suggested, though, that the mileage for business use was limited to demonstration rides for customers and local business errands. In comparison, the personal use was theoretically unlimited and involved, at a minimum, travelling to and from the store each day.

plans mandate the conclusion that their violations of the Act were willful.

Defendants concede that the test for finding willfulness is not overly rigorous. It requires only that, "the employer knew or suspected that his actions might violate the FLSA . . . Did the employer know the FLSA was in the picture?" *Coleman v. Jiffy June Farms, Inc.,* 458 F.2d 1139, 1142 (5th Cir. 1971), *cert. denied,* 409 U.S. 948, 93 S.Ct. 292, 34 L.Ed.2d 219 (1972). Having been investigated twice before, and having signed a consent judgment following the second investigation, defendants obviously knew that the Act was in the picture. Their arguments to the contrary lack the ring of sincerity. The two cases they cited found willfulness in violations far less egregious than this one. *See Coleman v. Jiffy June Farms, Inc., Id.; Thomas v. Louisiana,* 348 F.Supp. 792 (W.D.La.1972).

▪ Since defendants' violations were willful, the statute of limitations for this action is three years. 29 U.S.C. § 255(a). Computation of wages due commences with June 21, 1973.

E. *Unpaid minimum wages.*

Defendants' salespersons are due unpaid minimum wages in amounts to be calculated by the parties in accordance with this Memorandum-Decision and Order.

Defendants must pay minimum wages due from June 21, 1973 until the present. The basic minimum wage which defendants were obligated to pay their salespersons can be calculated by multiplying the applicable statutory hourly minimum wage by the number of hours worked during each week. Not all of the salespersons who are involved in this suit testified at trial. However, the Secretary called seven former salespersons as witnesses and defendants called three. In addition, a wage-hour compliance officer

of the Department of Labor testified that he had examined defendants' payroll records, interviewed employees, and ascertained an average workweek for defendants' salespersons. (Tr. 192). The court's finding as to the length of the average workweek differs from that of both the compliance officer and the defendants. The testimony, in its entirety, is sufficient to establish that this average workweek was, in fact, worked by all of the employees involved in this suit except Gorney, Mondore and Mantz. *See Hodgson v. Humphries,* 454 F.2d 1279 (10th Cir. 1972); *Wirtz v. Lieb,* 366 F.2d 412 (10th Cir. 1966). The number of hours worked by each employee except Gorney, Mondore and Mantz [11] between June 21, 1973, and December 31, 1975, was 55 hours per week; between Jan. 1, 1976 and the present the workweek has been 48 hours for all employees.

▪ The amount of back wages due to the salespersons is the deficiency between the minimum wage and the amount of pay received in each week that pay fell short of the minimum. Two adjustments must be made to this calculation: Vacation time must be considered, and interest added.

Where defendants' pay records indicate a vacation, the employee is entitled to no recovery for that period. Interest at the lawful rate in effect at the time in New York State is payable from the date of each deficiency on the amount found due. *Hodgson v. Wheaton Glass Co.,* 446 F.2d 527, 535 (3d Cir. 1971).

F. *Injunction.*

▪ Finally, the Secretary of Labor seeks an injunction restraining future violations of the Act. In view of defendants' past conduct, an injunction is appropriate.

---

11. During the period prior to January 1, 1976, employee Gorney's workweek was 52½ hours. *See* note 3 *supra.* At the same time, employee Mondore's workweek was 48 hours. *See* note 4 *supra.* For most of the period prior to January 1, 1976, the workweek of employee Mantz was 53 hours. However, because of the birth of her second child in April of 1974, her work- weeks during April, May and June of that year were very irregular. Specific findings for each of the workweeks are contained in note 6 *supra.*

After January 1, 1976, the workweeks for these employees matched those of the sales staff generally, 48 hours.

In part, the effect of an injunction will be to shift the burden of assuring compliance with the Act from plaintiff's shoulders to defendants'. *Dunlop v. Davis,* 524 F.2d 1278, 1280–81 (5th Cir. 1975). After three investigations of defendants' wage policies within ten years, one consent judgment, and the instant suit, such a shift is called for. Defendants' present compliance with the Act, and their assurances of future compliance do not obviate such relief, since "current compliance with the requirements of FLSA is no bar to prospective injunctive relief . . . ." *Id.* at 1281.

Defendants cite *Brennan v. Saghatelian,* 514 F.2d 619 (9th Cir. 1975), and argue that equitable considerations mitigate against issuance of an injunction. In *Saghatelian,* however, the court noted the numerous equities in defendant's favor and, on the facts of that case, declined to find that the trial court abused its discretion in refusing to issue an injunction. The numerous equities present in *Saghatelian* are absent from this case, most notably the finding that the defendant there was not willful in violating the Act. *Id.* at 621. Furthermore, there was considerable evidence that an injunction might seriously jeopardize defendant's business and the jobs of his employees. In this case, defendants presented no similar evidence, and they argued only that their public reputation and the marketability of their stock might be impaired. These assertions are insufficient to overcome the evidence demonstrating a need for injunctive relief.

On the basis of the defendants' past conduct—prior violations of the Act, falsification of employee time records, apparent disregard for the earlier consent judgment, and willful violations of the Act—an injunction restraining future violations of the Fair Labor Standards Act is necessary. 29 U.S.C. § 217.

The court has jurisdiction over this action, 29 U.S.C. § 217, and the parties herein. This Memorandum-Decision and Order constitutes the court's findings of fact and conclusions of law. Fed.R.Civ.P. 52.

The parties should encounter no problems in preparing a final judgment in accordance with this decision. The hours worked each week prior to 1976 have been fixed by the court at 55 with the exception of three employees. During and after 1976, the employees worked 48 hours per week. The parties have stipulated that the records accurately disclose the gross amount of pay received by each employee during each workweek. Accordingly, pursuant to this decision, the amount due each employee as indicated herein will be the difference between the applicable minimum wage for a 55 or 48 hour week, or as otherwise excepted, and the amount actually received during that week, if it is less than the minimum wage.

Within 30 days from the date of this order, the plaintiff is directed to submit to the court either a final judgment approved by the defendants or a proposed judgment for settlement on three days' notice.

SO ORDERED.