Beverly LUTHER, Plaintiff,

v.

Z. WILSON, INC., d/b/a Wilson Realtors, Defendant.

No. C–1–77–567.

United States District Court,
S. D. Ohio, W. D.

July 15, 1981.

Jerry F. Venn, Cincinnati, Ohio, for plaintiff.

Roger A. Weber, Cincinnati, Ohio, for defendant.

## OPINION

DAVID S. PORTER, Senior District Judge.

This is an action brought to recover minimum wages and overtime compensation due under the provisions of the Fair Labor Standards Act [FLSA], 29 U.S.C. § 201, *et seq.* Jurisdiction is conferred by 28 U.S.C. § 1337 for the cause of action arising under 29 U.S.C. § 216(b).

Plaintiff is a real estate broker and salesperson who was associated with the defendant, Z. Wilson, Inc. [hereinafter Wilson] from September 26, 1975 to December 31, 1976. From the beginning of her association with Wilson until October 31, 1976, plaintiff worked as the manager of Wilson's Harrison office; thereafter she was a sales agent only. Because of the limitations period of 29 U.S.C. § 255(a), the plaintiff has limited her claim to the time period commencing October 5, 1975 and ending October 31, 1976.

There is no dispute that defendant was at all relevant times in an enterprise engaged in commerce. Defendant acts as a broker for real estate in both Ohio and Indiana, participating in an interstate referral system. Defendant's annual gross volume of sales made or business done for each of the relevant years was in excess of $250,000. Defendant negotiated sales of property with a gross value of $20,930,677 in 1975, $24,777,970 in 1976, and $51,955,273 in 1977. Defendant is thus clearly an enterprise en-

gaged in commerce within the meaning of § 203(s).

At trial the following issues were presented:

(1) Was plaintiff defendant's employee?

(2) If plaintiff was defendant's employee, was plaintiff exempt as an outside salesperson or as an employee of a retail or service establishment?

(3) If plaintiff was exempt from coverage of the Act, did plaintiff receive the statutory minimum wage and was plaintiff adequately compensated for overtime?

(4) Who has the burden of proof as to hours worked, and does the burden shift to the defendant because no records were kept of plaintiff's hours?

(5) Is plaintiff entitled to an award of attorneys' fees?

■ Of course, if the relationship between the plaintiff and the defendant was not that of employer and employee, then the plaintiff falls outside the coverage of the Act and her claim for minimum wages and overtime compensation due must fail. In determining whether a particular individual is the employee of another for purposes of the Fair Labor Standards Act, the courts must look to the economic reality of the business relationship of the parties as a whole. *Rutherford Food Corporation v. McComb*, 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947); *Dunlop v. Dr. Pepper-PepsiCola Bottling Company*, 529 F.2d 298 (6th Cir. 1976). In making this determination, the courts will ordinarily consider a number of factors including the degree to which the alleged employee was independent or subject to the control of the defendant, the alleged employee's opportunity for profit and risk of loss, the alleged employee's investment in the facilities of the business, the permanency of the relationship, the degree of skill required, and the degree to which the alleged employee's services were an integral part of the defendant's business. *United States v. Silk*, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947); *Western Union Telegraph Company v. McComb*, 165 F.2d 65 (6th Cir. 1947), *cert.*

*denied*, 333 U.S. 862, 68 S.Ct. 743, 92 L.Ed. 1141 (1948). No individual factor is determinative, but rather the totality of the relationship must be the basis of decision.

■ Plaintiff had the ability to operate independently, but defendant exercised considerable control over her activities. Although plaintiff had a broker's license that enabled her to go into business on her own, she did not operate under that license while managing defendant's Harrison office, but operated under defendant's license. Except for organizing her own time, plaintiff's independent authority extended only to hiring and firing commission sales agents and to supervising salaried employees. The policies and procedures by which sales agents were to operate, and indeed the particular sales methods to be used, were all dictated by defendant's employee manual (px 1). Plaintiff chose a new site for the Harrison office, but her choice was subject to defendant's approval. Defendant held regular meetings for managers, and although attendance was not mandatory, defendant's president strongly advised plaintiff against missing these meetings. In short, defendant retained substantial control over the day-to-day operations of the office plaintiff managed.

Defendant's control also curtailed plaintiff's ability to increase her profit from the office. Plaintiff's contract was for 50% of the net profits of the Harrison office remaining after deduction of office expenses and a $500 administrative fee. All checks for agents' fees or earnest money were to be made payable to the defendant. Defendant determined whether and how much to spend for items such as advertising, equipment, new cars, and country club dues for the company president. Defendant determined what general expenses would be charged to the various offices. Plaintiff could, theoretically, have increased her profit by increasing the sales volume of the office, but defendant's control of spending determined whether there would be any profit for plaintiff to share in.

Moreover, plaintiff had no substantial share in the risk of loss for the Harrison office or the company in general. Plaintiff made no investment in the office furnishings. She owned only one share of stock in the company. She personally paid cash prizes to agents in her office, but these were voluntary payments she made to encourage them in productivity. Both plaintiff's risk of loss and investment in the facilities of the business were negligible.

There is some question as to the degree of permanency intended for the parties' business relationship. Plaintiff has stated that her contract was "from year to year," and there is evidence that plaintiff frequently changed companies. Nevertheless, there was no evidence that the relationship was to end at any fixed time. On balance, it appears that the parties intended an indefinite relationship as opposed to one aimed at accomplishing one limited object.

Plaintiff's work clearly required significant skill, both in her own sales and in hiring and training other sales agents. Defendant, however, set the policy and procedures to be followed by the sales staff, and it appeared that the managers had little input into such policy decisions. This latter factor tends to minimize the degree of skill required of the plaintiff as a manager.

Although plaintiff's activities clearly advanced her own interests, they were an integral part of defendant's business. Defendant's president admitted that a good manager was essential to the successful operation of an office. The Harrison office was not an independent unit. True, plaintiff hired and could fire the sales agents working there. Nevertheless, the agents all operated under defendant's license, and all contracts, stationery and advertising identified the Harrison office and the agents there as a part of defendant's business. It is clear that plaintiff was not operating her own real estate agency, but defendant's.

After plaintiff terminated her association with defendant, defendant put managers on salary. Defendant's president testified that he expected salaried managers to come when he called and required regular reports

from some of them. Apart from this, the only indication that salaried managers were further integrated into the defendant's business than plaintiff was that the company withheld taxes and Social Security when managers were salaried. Yet, defendant considered the salaried managers employees, but not plaintiff.

Defendant argues that 29 U.S.C. § 251(a), the preface to the Portal-to-Portal Act, requires that substantial weight be given to industry practices in determining issues under the Fair Labor Standards Act. The relevant language of § 251(a) is as follows:

> The Congress finds that the Fair Labor Standards Act of 1938, as amended, has been interpreted judicially in disregard of long-established customs, practices, and contracts between employers and employees, thereby creating wholly unexpected liabilities, immense in amount and retroactive in operation, upon employers
>
> . . . .

Defendant's argument ignores the fact that this declaration is a preface to specific legislative enactments intended to alleviate specific problems Congress believed to be caused by judicial interpretation. This section should not be viewed as a general statement of congressional policy with regard to portions of the Fair Labor Standards Act not specifically affected by the Portal-to-Portal Act. Moreover, the evidence of industry custom before the Court is inconclusive. The testimony at trial indicated that some real estate agencies treat their managers as salaried employees, but that others treat them more or less as independent contractors. We must base our determination in this case upon the elements of the relationship between plaintiff and defendant during the time of their association.

Considering the economic realities of the parties' relationship as a whole, it appears to us that plaintiff was an employee and not an independent businessperson or an equal partner in the business. Having determined that plaintiff was an employee, we must now determine whether or not she

was within either the outside salesperson exemption or the retail or service establishment employee exemption.

 Exemptions under the Fair Labor Standards Act are to be narrowly construed against the employer asserting them. *Arnold v. Ben Kanowsky, Incorporated*, 361 U.S. 388, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960); *Wirtz v. Atlanta Life Insurance Co.*, 311 F.2d 646 (6th Cir. 1963); *Hamblen v. Ware*, 526 F.2d 476 (6th Cir. 1975). With respect to the outside salesman exemption of 29 U.S.C. § 213(a), the regulations of the Wage and Hour Administrator have the force and effect of law. *Wirtz v. Keystone Readers Service, Inc.*, 418 F.2d 249 (5th Cir. 1969); *Hodgson v. Manning's Discount Decorating Center, Inc.*, 70 C.C.H. Labor Cases ¶ 32,819 (M.D. Tennessee, 1972). With respect to the retail or service establishment exemption, the interpretative regulations of the Administrator "may be used by the Courts for guidance and are entitled to considerable weight." *Hamblen v. Ware*, 526 F.2d 476 (6th Cir. 1975). The burden of proof as to any exemption is upon the defendant employer asserting it. *Hodgson v. Klages Coal and Ice Co.*, 435 F.2d 377 (6th Cir. 1970), *cert. denied*, 402 U.S. 973, 91 S.Ct. 1660, 29 L.Ed.2d 137 (1971).

Here, defendant first asserts that plaintiff is exempt from both the minimum wage and the overtime provisions of the Fair Labor Standards Act under 29 U.S.C. § 213(a)(1) as an outside salesperson. The regulations in 29 C.F.R. § 541.5 define an outside salesperson as:

. . . any employee:

(a) who is employed for the purpose of and who is customarily and regularly engaged away from his employer's place or places of business in:

(1) making sales within the meaning of section 3(k) of the Act, or

(2) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and

(b) whose hours of work of a nature other than that described in paragraph (a)(1) or (2) of this section do not exceed 20 percent of the hours worked in the work week by nonexempt employees of the employer: *provided*, that work performed incidental to and in conjunction with the employee's own outside sales or solicitations . . . shall not be regarded as nonexempt work.

Section 203(k) of the United States Code, Title 29 (§ 3(k) of the original Act) provides that:

" 'sale' or 'sell' includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition."

 It appears to us that plaintiff's sales activities, consisting of soliciting and making contracts for the sale of defendant's clients' property, falls within the definition of sales under the statute and regulations. Further, plaintiff's work of obtaining listings falls within the regulations' definition of obtaining contracts for services. *See*, 29 C.F.R. § 541.5(a)(1). Finally, time that plaintiff spent in the Harrison office or at home on telephone solicitations or in writing contracts for her clients was incidental to her own outside sales or solicitations. Prospective sellers or purchasers who called while plaintiff was on telephone duty were plaintiff's exclusive customers and only she had a right then to obtain their listing or show them homes. In either event, the initial phone contact was only the beginning of the plaintiff's work with that client, and most of the plaintiff's work with that client would be carried on outside the office. Nevertheless, we believe that defendant has failed to carry its burden of proof with respect to the time limitation on nonexempt work performed by the plaintiff.

There is scant evidence on this issue. Plaintiff's breakdown of the hours she generally worked on a daily basis could support a minimum of 55½[1] hours per week or a

---

1. Although we ultimately conclude that plaintiff worked not less than an average of 50½ hours per week, *infra*, we reach that conclusion by resolving every inconsistency in the record in defendant's favor. Here, where defendant has the burden of proof, we need not, and indeed should not do so.

maximum of 67 hours per week. Plaintiff testified that she worked an average of 64 hours per week. The only other manager who testified as to the number of hours he worked in a week stated that he worked between 60 and 70 hours per week. Thus, if the plaintiff is right that Wilson managers are generally nonexempt employees, then the average weekly hours of nonexempt employees doing the same kind of work plaintiff was doing would range somewhere between 58 and 68 hours per week. Twenty percent of those hours would equal somewhere between 11½ and 13½ hours per week. Of course, if defendant is right, and Wilson managers are exempt generally, then the maximum limit that plaintiff could perform nonexempt work would be eight hours. 29 C.F.R. § 541.507.

Plaintiff adopted as part of her testimony at trial an affidavit she had originally submitted in support of the motion for partial summary judgment. In that affidavit plaintiff stated that during that part of 1975 that she worked for defendant she spent "approximately eight to ten hours each week in actual selling activities ... [including] not only face-to-face contacts with prospects, but in-office time making phone calls and performing other activities incidental to [her] selling responsibilities" (plaintiff's affidavit, ¶ 9). This statement is the only evidence on the record regarding plaintiff's 1975 sales activities. As to 1975, defendant has clearly not borne its burden of proof.

As to 1976, plaintiff in her affidavit states that she spent approximately 20 to 25 hours on selling activities (id.). In addition, plaintiff admitted that she had claimed a tax deduction in 1976 of $5,215.00 for business mileage at 15¢ per mile. She also admitted that 80% of that mileage was driven in sales-related activity. This combination of evidence allows us to conclude that plaintiff drove an average of 12 to 18 hours per week in sales-related activity. Thus, even if defendant is given the benefit of the most extreme inferences possible—that plaintiff worked no more than 55½ hours

per week, that the other manager who testified worked always 70 per week, that plaintiff spent 25 hours per week in sales-related activity other than driving and 18 hours per week in sales-related driving—plaintiff would fall only three minutes under the 20% time limit. Even under these extreme conditions, plaintiff would have worked 12½ hours on management duties, and 20% of the average hours of office managers would be 12.55 hours if plaintiff worked 55½ hours. We cannot say on the basis of such evidence that plaintiff more probably than not spent less than 20% of her time in managerial activities during 1976. Accordingly, we find that plaintiff was not exempt during either 1975 or 1976 as an outside salesperson.

Defendant also claimed exemption from the overtime provisions of the Act under 29 U.S.C. § 207(i) which applies to employees "of a retail or service establishment." Although it is clear that defendant is in the business of providing a service, not all service establishments can qualify for this exemption. *See Brennan v. Southern Productions, Inc.,* 513 F.2d 740 (6th Cir. 1975). While not defined in § 207, nor in the general definitions of § 203, the term "retail or service establishment" has long been a part of Fair Labor Standards Act exemptions in § 213. There Congress, in 1949, defined the term to mean "an establishment 70 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry." 29 U.S.C. § 213(a)(2). There is no indication that Congress intended any different meaning for the term in § 207.

In determining the applicability of a "retail or service establishment" exemption to a particular business, a two-step analysis is required. First, the business must be in an industry that has a retail concept, and second, the criteria of percentage of sales not for resale and of industry recognition must be met. *See Mitchell v. Kentucky Finance Co.,* 359 U.S. 290, 79

S.Ct. 756, 3 L.Ed.2d 815 (1959); 29 C.F.R. § 779.314 (1979). Defendant here has failed to establish either prong of this test. We agree with the Wage and Hour Administrator that there is no retail concept in the real estate industry. *See* 29 C.F.R. § 779.-317 (1979). Purchasing a home or other property is not part of the "everyday needs of the community," but is a major investment occurring infrequently in the lives of most people. *See, id.* § 779.318. By contrast, traditional retail establishments, such as grocery stores, hardware stores, clothing stores, barber shops, restaurants and others, supply in small quantities and at relatively modest cost the recurrent needs of the community. They are located, most often, at the end of a long distributive chain. *Id.* The defendant's business partakes of none of these elements of the traditional retail concept. Moreover, even if the real estate industry were within that concept, defendant has produced no evidence that the other statutory elements were present in its business. There is no evidence that 75% of defendant's own sales were not for resale, nor was there any evidence that the industry recognizes sales like the defendant's as retail. Accordingly, we find that plaintiff was not exempt as an employee of a retail or service establishment.

In determining the plaintiff's minimum wage and overtime compensation claims, the first issue that must be resolved is what is the applicable period for which payments must equal the statutory requirements. Resolution of this issue is made exceedingly difficult by the sporadic nature of the commission payments plaintiff received and by conflicting statements, in both case law and administrative interpretations regarding the "work week standard" of the Act and the payroll period.

On the one hand, the Wage and Hour Administrator has stated that "section 6(b) of the Act . . . is applicable on a work week basis and *requires payment* of the prescribed minimum wages to each employee who 'in any work week' is employed in a covered enterprise." Wage Hour Opinion Letter No. 125 (August 14, 1962) (emphasis added). The regulations, in 29 C.F.R.

§ 778.104, indicate that the "Act takes a single work week as its standard and does not permit averaging of hours over two or more weeks." On the other hand, the regulations in § 778.106 provide that there is no requirement in the Act that overtime compensation be paid weekly. Furthermore, the Wage Hour Administrator has indicated that "while the Act does not require that the employee's compensation must be paid weekly, it does require the employer to pay minimum wages due for the particular work week on the regular pay day for the period in which such work week ends." Opinion Letter No. 63 (November 30, 1961).

The administrative confusion has carried over to the courts. In one recent case the Court broadly declared that "regardless of the total pay received by an employee, the Act requires that each employee receive, each week, an amount equal to the minimum wage times the number of hours worked." *Marshall v. Sam Dell's Dodge Corp.,* 451 F.Supp. 294 (N.D.N.Y. 1978). Another recent case states to the contrary that "there is nothing in the law that says a pay period has to be one week only or that employees must be paid weekly. A pay period can be one week, two weeks, or a month (or, as pointed out by plaintiff, even longer)." *Marshall v. Allen-Russell Ford, Inc.,* 488 F.Supp. 615, 618 (E.D.Tenn.1980). Analysis of numerous cases and administrative interpretations in regard to this issue reveals three separate principles at work. Failure to distinguish among these principles results occasionally in *dicta* that payment for hours worked must be made in every work week. The first of these principles is that work weeks may not be averaged to avoid the obligation to pay overtime compensation. *See, e.g., Roland Electrical Co. v. Black,* 163 F.2d 417 (4th Cir. 1947), *cert. denied,* 333 U.S. 854, 68 S.Ct. 72, 92 L.Ed. 1135 (1948); *Travis v. Ray,* 41 F.Supp. 6 (W.D.Ky.1941). Second, pay periods may not be averaged, as, for example, where an employee works 20 hours one week and 30 hours the next at a salary sufficient to cover 25 hours, in order to avoid paying minimum wage compensa-

tion in a longer than average week. *See, e.g.,* Wage and Hour Opinion Letter No. 24 (October 3, 1961); *cf., United States v. Klinghoffer Brothers Realty Corp.,* 285 F.2d 487, 493 (2d Cir. 1960) (extra hours may be required of a salaried employee so long as the salary is adequate to cover the minimum due for the total hours worked). Third, an employer and an employee are free to contract for any regular pay period. *See,* Wage and Hour Opinion Letter No. 63 (November 30, 1961). Ordinarily, the relevant pay period is determined from the actual pattern of payments adopted by the parties. *See, Marshall v. Allen-Russell Ford, Inc.,* 488 F.Supp. 615 (E.D.Tenn.1980); *Marshall v. Sam Dell's Dodge Corp.,* 451 F.Supp. 294 (N.D.N.Y.1978); *Travis v. Ray,* 41 F.Supp. 6 (W.D.Ky.1941); Wage and Hour Opinion Letters No. 1296 (WH–244) (November 27, 1973), No. 116 (August 2, 1962). Weekly, semi-monthly, and monthly payroll periods have been approved, and indeed one Court has indicated that even longer periods may be permitted. *Marshall v. Allen-Russell Ford, Inc.,* 488 F.Supp. 615 (E.D.Tenn.1980).

In the case at bar there has been no regular pattern of payment. The parties agreed that plaintiff would be paid for her sales work if and when the sale of a house she had listed or sold was closed, and, with respect to plaintiff's management duties, the parties agreed that plaintiff would be paid at the end of each calendar year a commission of 5% of the net office profits. As a result, plaintiff received, at odd intervals, commission payments ranging from just under $200 to just over $1100. Plaintiff never received any management commission, however, because, under defendant's accounting system, the Harrison office suffered a net loss in both of the years plaintiff was manager there.

In a recent case involving irregular commission payments to yacht salesmen, the Secretary of Labor proposed that "the interval from commission payment to commission payment" should be deemed the relevant payroll period. *Brennan v. Lauderdale Yacht Basin, Inc.,* 493 F.2d 188, 191 (5th Cir. 1974). The District Court in that

case had applied an annual interval, and the Fifth Circuit in remanding the case prescribed a reasonable and equitable apportionment of the commissions. *Id.*

Although the parties in the case at bar did agree that compensation for plaintiff's management duties would be paid at year end, the payment of other commissions in the interim negates any inference that an annual pay period was intended. Moreover, we are of the opinion that an annual pay period cannot be equitably adopted in light of the Act's basic policy that minimum wage payments should be regularly and promptly made. *See, Brooklyn Savings Bank v. O'Neal,* 324 U.S. 697, 707–08, 65 S.Ct. 895, 902, 89 L.Ed. 1296 (1945); *United States v. Klinghoffer Brothers Realty Corp.,* 285 F.2d 487, 491 (2d Cir. 1960); *Marshall v. Sam Dell's Dodge Corp.,* 451 F.Supp. 294, 302–03 (N.D.N.Y.1978).

In some cases, adopting a commission-to-commission interval would share the flaw of an annual pay period if the employee worked frequent, long periods without compensation. During the period involved in the case at bar, however, the interval between plaintiff's commissions only once embraced even so many as six work weeks, and only twice included five work weeks. Even a monthly pay period, approved in cases and interpretive opinions already mentioned, would involve occasional five work-week pay periods. Therefore, we hold that a commission-to-commission interval would not be inequitable to the plaintiff here.

We also note that in some cases a commission-to-commission interval would be inequitable to the defendant-employer. Such would be the case where an employee's commissions were extremely high in successive weeks, so that very high commissions would be spread over relatively few weeks. In the case at bar, however, a commission-to-commission payroll period spreads plaintiff's income more evenly than would any pay period not exceeding one month. Because neither the facts of the case at bar nor the policy of the minimum wage provi-

sions of the Act would support such an extended pay period, we hold that the commission-to-commission pay period is not inequitable to defendant here.

The Court therefore adopts as the relevant pay period for calculation of both plaintiff's minimum wage and overtime claims the interval from commission payment to commission payment. Each such payment shall be regarded as compensation for the work weeks, ending on Saturday midnight, during the interval between that payment and the preceding payment. Whenever no work week ends between commission payments, such payments shall be added together, and the total shall be applied to all work weeks ending before the first such payment.

■ We find that plaintiff worked at least 50½ hours per week. Although plaintiff is charged with producing definite and certain evidence of the hours she worked, where the inaccuracy of plaintiff's evidence is due to the employer's failure to keep adequate records as required by the Act, the Court must make an award based upon evidence sufficient to show the amount and extent of plaintiff's work as a matter of just and reasonable inference. *Anderson v. Mount Clemens Pottery Co.*, 328 U.S. 680, 687–88, 66 S.Ct. 1187, 1192, 90 L.Ed. 1515 (1946); *Reeves v. International Telephone and Telegraph Company*, 616 F.2d 1342, 1351 (5th Cir. 1980), *cert. denied* 101 S.Ct. 857, 449 U.S. 1077, 66 L.Ed.2d 800 (1981); *Hodgson v. Elm Hill Meats Inc.*, 463 F.2d 1186 (6th Cir. 1972). Plaintiff testified that she worked from 8:30 or 9:00 o'clock until 5:00 o'clock on weekdays, returning to work in the evening from 7:00 or 8:00 until 9:30 or 10:00 o'clock. Plaintiff also testified that she worked on Saturdays from 10:00 until 5:00 or 5:30 and Sundays from 11:00 or 11:30 until 5:00, if she was conducting an open-house or until 7:30 or 8:00, if she was showing homes to customers. She added that her average stopping time for Sundays was 6:30 or 7:00 o'clock. Plaintiff's testimony was corroborated for the daytime hours during the period from November, 1975 to May, 1976 by records of a nursery

near the office where plaintiff dropped her daughter off before going to work. These records indicate, however, that plaintiff ended her work day generally between 4:30 and 5:00 o'clock. Plaintiff's niece, who lived with her from fall of 1976 to Easter of 1977, testified that plaintiff left home at 8:00 or 8:15 and returned at 6:00 o'clock, or sometimes later. Plaintiff's regular babysitter during the period of February to August, 1976 stated that plaintiff did not usually work Friday evenings but did work on Saturdays "leav[ing] home at 10:00 or 11:00 and ... back at 5:00 or 7:00 p.m.," and Sundays "leav[ing] home" at 11:00 and back at 7:00 or 8:00 p. m. Plaintiff's niece also testified that plaintiff worked three or four nights a week until 8:00 or 9:00 o'clock, spending time on other evenings on telephone work. As to weekends, plaintiff's niece testified that plaintiff left home at 9:00 or 10:00 on Saturday, getting home by 6:00 o'clock and that plaintiff left home on Sundays at 11:00 or 12:00, working five or six hours.

■ From the preceding jumble of evidence, we conclude that plaintiff generally worked from 9:00 a. m. until 4:30 p. m. Monday through Friday, plus at least an hour and a half each of four weekday evenings. We find that she worked on Saturdays from at least 11:30 to 4:30 (giving defendant credit for one-half hour of driving time between plaintiff's home and the office). We find that plaintiff worked on Sundays from at least 11:30 to 5:00 o'clock. As to each daily period involving the noon hour, we give defendant credit for one-half hour of lunch time. Thus, we conclude that plaintiff worked no less than 50½ hours each week, and her damages should be computed on that basis.

Thus, for each pay period as defined above, the hourly rate must be established according to the following formula:

$$\frac{\text{total commission paid for period}}{\text{number of weeks in period} \times 50.5} = \text{hourly rate.}$$

For each week in a pay period for which the hourly rate *does not* exceed the applicable minimum wage rate, plaintiff shall be entitled to an award equal to the difference

between the hourly rate (HR) and the minimum wage rate (MWR) times 50.5 hours plus one-half of the minimum wage rate times 10.5 hours for overtime—*i.e.,* ((MWR – HR) × 50.5) + ((.5 × MWR) × 10.5). For each week in a pay period for which the hourly rate *does* exceed the applicable minimum wage rate, plaintiff shall be entitled to an award equal to one-half of the hourly rate times 10.5 hours for overtime, *i.e.,* ((.5 × HR) × 10.5).

 We reject defendant's assertion that the agreement between itself and plaintiff provided that overtime compensation should be included in the commissions plaintiff received. Defendant's argument, based upon *Brennan v. Lauderdale Yacht Basin, Inc.,* 493 F.2d 188 (5th Cir. 1974), overlooks the fact that the Act prescribes specific elements that must be included in an agreement of this sort. *See* 29 U.S.C. § 207; *Warren-Bradshaw Drilling Co. v. Hall,* 317 U.S. 88, 63 S.Ct. 125, 87 L.Ed. 83 (1942); *Overnight Motor Transportation Co. v. Missel Co.,* 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682 (1942); *Brennan v. Valley Towing Co.,* 515 F.2d 100 (9th Cir. 1975); *Walling v. Stone,* 131 F.2d 461 (7th Cir. 1942). *See generally* Annotation, 89 L.Ed. 35, 39. In particular § 207(f) permits an agreement that would guarantee a fixed compensation based upon a guaranteed number of hours, and § 207(g) permits employment agreements to provide for a basic rate from which overtime compensation may be computed. That some such agreement could have been made here, we do not doubt. *See generally Brennan v. Miller Buick, Inc.,* No. 73–801–T, 77 C.C.H. Lab. Cas. ¶ 33,291 (D. Md. April 8, 1975). Nevertheless, the facts adduced at trial reveal nothing more than an agreement that plaintiff's commissions would be the only compensation due. Such an agreement does not contain the statutorily required elements and is ineffective to prevent an award of overtime compensation. Therefore, an award shall be made as set forth above.

 This brings us to the final issue in this case, that of attorneys fees. The award of attorneys fees in Fair Labor Standards Act cases is mandatory, only the amount is within the discretion of the District Court. 29 U.S.C. § 216 ("the court in such action shall ... allow a reasonable attorney's fee ...."); *see Crook v. B & G Stereo,* 627 F.2d 1089 (6th Cir. 1980); *Conklin v. Joseph C. Hoffgesang Sand Co.,* 565 F.2d 405, 407 (6th Cir. 1977). *Contra Yadav v. Coleman Oldsmobile, Inc.,* 538 F.2d 1206 (5th Cir. 1976). The good faith exemption of 29 U.S.C. § 260 applies only to liquidated damages and not to attorney's fees. *Weisel v. Singapore Joint Venture, Inc.,* 602 F.2d 1185, 1199 n. 18 (5th Cir. 1979); *Wright v. Carrigg,* 275 F.2d 448 (4th Cir. 1960). *Contra Yadav v. Coleman Oldsmobile, Inc.,* 538 F.2d 1206 (5th Cir. 1976).

 Although the amount of fees is discretionary with the Court, the focus of the award should be on the face market value of the attorney's services. Nevertheless, the Court may consider the amount of recovery, without placing too great a reliance on this factor. *Crook v. B & G Stereo,* 627 F.2d 1089 (6th Cir. 1980). Accordingly, the Court finds that plaintiff's attorney expended 238.5 compensable hours on this case, of which 234.5 should be billed at the requested rate of $60 per hour, which the Court finds to be a reasonable rate. The remaining four compensable hours were expended in a review of nursery time sheets in order to prepare an estimate of plaintiff's hours. This work could have been performed by less costly personnel and should be billed at the hourly rate of $5 per hour. The remaining hour and a half of plaintiff's counsel's requested hours is uncompensable time spent filing and serving papers in this case. Accordingly, the Court finds that the fair market value of plaintiff's trial attorney's services is $14,097.50. This amount will be reduced by a factor of 25% to bring the award of fees more in line with the amount of recovery in this case. The amount requested in the statement of the firm of Smith & Schnacke is disallowed for lack of proper substantiation, unless within 15 days of the filing of this opinion substantiation equivalent to that provided by plaintiff's trial attorney is supplied, in

which case it will be subject to the same reduction factor applied to plaintiff's trial attorney's fees.