**James OLSON, Plaintiff-Appellant,**

v.

**SUPERIOR PONTIAC–GMC, INC., Defendant-Appellee.**

**No. 84–3023.**

United States Court of Appeals, Eleventh Circuit.

July 23, 1985.

Hatchett, Circuit Judge, concurred in part, dissented in part, and filed an opinion.

---

Robert F. McKee, Tampa, Fla., for plaintiff-appellant.

Chris W. Altenberend, IV, John W. Robinson, IV, Tampa, Fla., for defendant-appellee.

Before HATCHETT and CLARK, Circuit Judges and STAFFORD *, District Judge.

CLARK, Circuit Judge:

This is a Fair Labor Standards Act case involving an automobile salesman who was employed at the Defendant-Appellee's automobile dealership. James Olson, the plaintiff below and appellant herein, filed this action alleging that he was not compensated by the Appellee Superior Pontiac-GMC, Inc. [Superior] in accordance with the minimum wage required by 29 U.S.C. § 206.

* Honorable William H. Stafford, Chief U.S. District Judge for the Northern District of Florida, sitting by designation.

We shall summarize the evidence and the findings of the district court.

Olson was employed as a used car salesman by Superior from April, 1981 until September, 1982. Superior utilized a multiple method of compensating its salesmen. Salesmen were paid daily cash bonuses called SPIFFS for selling designated cars or options. In addition, sales managers would pay cash bonuses to salesmen during their daily sales meetings.[1] Monthly bonuses were paid for volume sales by sales managers based on their unit's performance. Superior also paid commissions on the sale of automobiles. Salesmen received a percentage of the gross profits generated by each sale they closed.

Superior's salesmen received both weekly and monthly checks. Under Superior's method of compensation, on each Thursday salesmen would receive 70% of the total commissions earned the previous week. This 70% figure was reduced if the salesperson had been advanced money.

At the end of the month, Superior would issue a settlement check to its salesmen. The settlement check consisted of the 30% that was withheld from each weekly check. The 30% was withheld from the weekly checks in order to provide salesmen with a check at the end of the month and to enable Superior to deduct taxes incurred on cash bonuses that were paid to the salesmen during the month.[2]

The district court found that Superior's salesmen understood that Superior utilized a monthly pay plan and that most accounting in the automobile industry was done on a monthly basis. Thus, the court concluded that Superior utilized a monthly pay plan even though its salesmen also received weekly checks.

Olson's claim to unpaid minimum wages is restricted to three months. The following chart illustrates the district court's findings.

| Month/Year | Minimum Wage Deficiency | Excess Over Minimum Wage |
| --- | --- | --- |
| September/1981 | 0 | $415.00 |
| October/1981 | $ 48.41 | 0 |
| November/1981 | $175.15 | 0 |
| August/1982 | 0 | $505.00 |
| September/1982 | $234.50 | 0 |

The district court concluded that the amendment to the Handbook allowed " 'the excess ... [to] be carried forward and applied to the *next* settlement date.' " *Olson v. Superior Pontiac-GMC, Inc.*, No. 83–207–Civ–T–15, slip op. at 3 (M.D.Fla. Dec. 27, 1983) [hereinafter cited as *Dist.Ct.Op.*].

The court reasoned:

Although the August, 1982 excess could be applied to September of that year, the September, 1981 excess could be applied only to the October, 1981 deficiency. Therefore, plaintiff was not paid the minimum wage for November, 1981, under the regulations in effect at that time.

*Id.* Thus, the district court's analysis was focused on the issue of whether Superior was subject to liability for the failure to pay minimum wages in November, 1981.

The district court found that the Wage and Hour Field Operations Handbook was amended in March, 1981. The pertinent section of the Handbook provided:

"If the employer advanced $70 to the commission sales person to satisfy the minimum wage requirement, this amount may be recovered from excess commissions earned in the subsequent settlement period. Similarly, commissions computed on the settlement date which are in excess of the amount required to satisfy the minimum wage requirements may be carried forward and applied to the minimum wage on the next settlement date."

*Id.* at 3. The district court concluded that Superior's management personnel gave dif-

---

1. *See Record,* Volume II at 17–18.

2. *Id.* at 19. *See Infra.* "Superior's Plan."

fering interpretations to the amendment of the Handbook. The court stated:

> Mr. Douglas Tew was defendant's Assistant Comptroller and the person responsible for implementing the salesmen's pay plan. Mr. Tew testified that if a salesman's commissions during the month were less than the minimum wage for the hours worked by that salesman, the amount below minimum wage could be carried forward to any future month in which the salesman earned more than the minimum wage. Defendant's President and General Manager, Mr. Wooley, testified that he believed that amounts exceeding the monthly minimum wage could be carried forward to cover later months when a salesman's commissions might not meet the minimum wage requirements. In other words, Mr. Tew believed excess commissions would be carried forward while Mr. Wooley thought deficiencies should be carried forward.

*Id.* at 3–4. Because the district court found that Superior had relied on the Wage and Hour Field Operation Handbook in good faith, it concluded that Superior was not subject to liability for the failure to pay minimum wages in November, 1981 due to the good faith defense found in 29 U.S.C. § 259. Thus, the district court ruled in favor of Superior. We reverse because the district court erred when it concluded: (1) Superior's monthly pay period met the record-keeping requirements of the statute, 29 U.S.C. § 211 and 29 C.F.R. § 516.2 (1984); and (2) Superior was exonerated from liability due to its good faith attempt to conform with the handbook's interpretation of the minimum wage law.

## I. *Superior's Plan*

The evidence demonstrates that Superior deducted federal withholding and FICA taxes, medical insurance premiums, ex-

penses for the use of certain automobiles and other amounts from the weekly paychecks. Superior had a policy that required its salesmen to complete weekly time sheets that indicated the number of hours worked each day and the total hours worked during the week. Salesmen were required to submit their time sheets before they could receive a pay check.[3] At trial Superior submitted these time sheets, a payroll summary, and a computer pay schedule that summarized its payments to Olson. These documents set forth the dates upon which Olson received payments, and settlement checks.[4] The payroll summary also illustrated Olson's gross and net earnings for each week and month. *Superior did not produce records* that summarized the number of hours worked each month or the number of days within each monthly pay period.

Superior's *Salesman's Pay Plan and Procedures*, provided in pertinent part:

> Salesmen will be paid once a week on Thursday. Commissions will be paid on all deals billable and in the business office Tuesday at close of business.
>
> Pay consists of 25% of gross profit except for after sale items qualifying as CIF (cash in fist) bonuses.
>
> 70% of earned commissions will be paid weekly. 30% will be carried over till the end of the month to cover receivables and taxes on bonuses.

*Record,* Plaintiff's Exhibit No. 1. Mr. Wooley, the president and general manager of Superior, indicated that the *Salesman's Pay Plan and Procedures* was not intended to be an official policy when it was printed. He testified:

> It is to give the salesmen the basic ground rules and basically when he can expect to be paid, what we bonus on and what we don't bonus on and what the rules of the dealership are. That's primarily what it was intended for.

---

3. Douglas Tew, who was employed by Superior as an assistant controller during the relevant period, testified that although submitting time sheets was a company policy, it was not always enforced. Tew also testified that Superior filed the time sheets and that the payroll clerk looked over them to insure that each salesperson had submitted one. According to Tew, the time sheets were not used for any other purpose.

4. The documents also summarized the amount of earnings and the various deductions from earnings. *See Record,* Defendant's Exhibits 2–3.

*Record* Vol. II at 65. Mr. Wooley did not know when the document was prepared or whether it was available to Mr. Olson.

The district court found that a monthly pay plan was utilized.[5] In supporting its conclusion the court stated:

> Therefore, although salesmen received a check each week, they were paid pursuant to a monthly pay plan. Testimony revealed that most accounting in the automobile industry is done on a monthly basis. Furthermore, all salesmen understood that defendant used a monthly pay plan. Plaintiff did not take the stand to testify that he had any reason to believe the pay plan was weekly. Absent Plaintiff's testimony, the record equally supports the Defendant's testimony that the pay plan was monthly. The Plaintiff has not met his burden of proof.

*Dist. Ct. Op.* at 2.

Superior claims the following evidence, which the district court examined, supports the court's finding of a monthly pay plan: (1) each month Superior paid its salesmen monthly cash volume sales bonuses; (2) Superior withheld 30% of the sales commissions until the end of each month; (3) Olson did not testify to refute Superior's testimony of a monthly plan; (4) accounting in the automobile industry focuses on monthly figures; (5) sales personnel understood they were compensated pursuant to a monthly plan; and (6) two employees testified that Superior utilized a monthly plan.

Olson responds to Superior's contentions by arguing the record does not reflect the salesmen understood that the pay plan was monthly. The only evidence in the record that addresses this issue is the *Salesman's Pay Plan and Procedure* and the testimony of Mr. Wooley, Superior's president and general manager. Contrary to appellee's contention, the district court did not find

that *two* employees testified there was a monthly plan.

Olson also contends the following factors support a finding that a weekly plan was utilized: (1) testimony that payroll checks were issued weekly; (2) the weekly checks represented 70% of all commissions earned during the preceding week; (3) a weekly check was not issued if commissions were not earned during the prior week; (4) Superior made regular deductions of FICA and federal withholding taxes, medical insurance, and any federal tax delinquencies from previous months; and (5) Superior utilized weekly time sheets.

Before we can address the parties' contentions, we must determine whether a monthly pay plan is permitted under the Act.

### A. *Is a Monthly Pay Plan Permissible*

■ The appellant directs our attention to *Luther v. Wilson, Inc.*, 528 F.Supp. 1166 (S.D.Ohio 1981). In which the court stated:

> In one recent case the Court broadly declared that "regardless of the total pay received by an employee, the Act requires that each employee receive, each week, an amount equal to the minimum wage times the number of hours worked." *Marshall v. Sam Dell's Dodge Corp.*, 451 F.Supp. 294 (N.D.N.Y.1978). Another recent case states to the contrary that "there is nothing in the law that says the pay period has to be one week only or that employees must be paid weekly. A pay period can be one week, two weeks, or a month (or, as pointed out by plaintiff, even longer)." *Marshall v. Allen-Russell Ford, Inc.*, 488 F.Supp. 615, 618 (E.D.Tenn.1980). Analysis of numerous cases ... reveals three separate principles at work. The first of these principles is that work

---

5. We agree that there was evidence upon which the district court could find that Superior used a monthly pay plan. There was also evidence which would have permitted the district court to find the company used a weekly pay plan. We discuss, *infra* text accompanying note 11, that an employer must keep better records than merely those showing pay periods. The statute,

29 U.S.C. § 211(c), 29 C.F.R. § 516.2 (1984), requires an employer to keep records to permit enforcement of the statute. In this case, Superior's records were not maintained in a manner to permit collation of the time worked and the compensation paid to determine compliance with the statute.

weeks may not be averaged to avoid the obligation to pay overtime compensation. Second, pay periods may not be averaged, as, for example, where an employee works 20 hours one week and 30 hours the next at a salary sufficient to cover 25 hours, in order to avoid paying minimum wage compensation in a longer than average week.... Weekly, semimonthly, and monthly payroll periods have been approved, and indeed one Court has indicated that even longer periods may be permitted. *Marshall v. Allen-Russell Ford, Inc.,* 488 F.Supp. 615 (E.D.Tenn.1980).

*Id.* at 1173–74. The *Luther* court found that a pay period in excess of one week was permissible. *Id.* at 1175 (permitting pay period interval from commission payment to commission payment). The regulations that address commission payments support the *Luther* court's finding. They provide:

> Commissions ... are payments for hours worked and must be included in the regular rate. This is true regardless of whether the commission is the sole source of the employee's compensation or is paid in addition to a guaranteed salary or hourly rate, or on some other basis, and regardless of the method, frequency, or regularity of computing, allocating and paying the commission. *It does not matter whether the commission earnings are computed daily, weekly, biweekly, semimonthly, monthly, or at some other interval. The fact that the commission is paid on a basis other than weekly, and that payment is delayed for a time past the employee's normal pay day or pay period, does not*

*excuse the employer from including this payment in the employee's regular rate.*

29 C.F.R. § 778.117 (1984) (emphasis added). We agree and hold that periods in excess of a week are permissible under the Act. However, for the reasons discussed below we hold the *employer* has the burden of proving the duration of its pay period. We now address whether Superior's pay plan was based on a weekly, monthly, or some other period.

B. *The Duration of Superior's Pay Plan*

The pay plan used by Superior is similar to the one discussed in *Marshall v. Allen-Russell Ford Inc.,* 488 F.Supp. 615 (E.D. Tenn.1980). In *Marshall* the defendants paid their sales personnel according to a 60%–40% or 80%–20% pay plan. Under the plan used by the defendant in that case, sales personnel were paid a large percentage of their commissions each week. At the end of the month, the remaining percentage of the commissions earned during the month plus or minus any monthly bonuses or deductions would be paid. Unlike this case, in *Allen-Russell* the weekly paychecks were not considered regular payroll checks and no deductions were made from them. The court found that the pay period utilized was the calendar month.[6]

This case differs from *Allen-Russell* due to the regularity of the weekly checks and the deductions from the checks of insurance, federal withholding and FICA. In addition, we cannot determine from this record, whether the salesmen believed they were being compensated pursuant to a monthly or weekly plan.[7]

---

**6.** In *Marshall v. Sam Dell's Dodge Corp.,* 451 F.Supp. 294 (N.D.N.Y.1978), each car salesperson was compensated with a combination of base pay, commissions and bonuses. The weekly base pay was not related to the sales made, although commissions and bonuses were directly related to sales. Payment of the commissions was staggered and bonuses were paid weekly, monthly or annually. Pay checks and time sheets were handed out weekly and salesmen were required to submit a time sheet before they could receive a check. The employer contended that a period other than a week should have been used in assessing compliance with the

minimum wage requirements of the act. The court rejected this contention because it found that the Act required an employer to utilize a weekly pay period. *Id.* at 303. For this reason, the case does not assist to our analysis.

**7.** Superior also argues that the nature of the automobile industry's record keeping practices demonstrates that a monthly period was utilized. This contention is supported by testimony that Superior completed all of its record keeping on a monthly basis and that it attempted to pay its salesmen the total amount of commissions earned at the end of the month. Addition-

Superior's method of compensation attempts to be a variation of the straight commission with advances, guarantees, or draws method that is set forth in the regulations. Under that method:

> [T]he employee is paid a fixed weekly, biweekly, semimonthly, or monthly "advance," "guarantee," or "draw." At *periodic intervals* a settlement is made at which time the payments already made are supplemented by an additional amount by which his commission earnings exceed the amounts previously paid.

29 C.F.R. § 779.413(a)(5) (1984) (emphasis added).

The regulations above as well as the Wage and Hour Field Operations Handbook, upon which Superior relies, are based on the premise that the employer will develop a method of compensation that has a periodic pay and settlement period.[8] The relevant Wage and Hour Field Operations Handbook provided:

> *[W]here the employer has in fact established a settlement period,* draws against commission earnings within the settlement period need not be at the minimum wage rate. The employer may then credit this draw or guarantee as an advance of any commissions when set-

tling out the amount due to the employee *at the end of the period for which the commissions were earned, as long as such settlement results in payment of the minimum wage for all hours comprising the settlement period.*

*Record,* Plaintiff's Exhibit 2 at 2 (emphasis added).

A periodic or fixed pay and settlement period is particularly needed when an employer utilizes a complex method of compensation such as the one used by Superior. Without a pay plan that correlates earnings with a fixed time period, neither the employer nor any reviewing authority can accurately determine whether the employee has been paid the minimum wage for each hour worked within the period. The following example illustrates this principle.

If an employer presented evidence that it utilized a four week pay period (P), it had employees that worked 40 hours each week (H), and it had paid each employee a total of $7,000.00 in earnings (E), the court and the employer would be able to accurately determine whether the minimum wage had been paid for each hour worked during the pay period by utilizing an equation similar to the one below.

$$\frac{(E)}{(H) \times (P)} = \text{Hourly Wage for the Pay and Settlement Period}$$

$$\frac{\$7,000.00}{40 \times 28} = \$6.25 \text{ [9]}$$

ally, Superior presented a pamphlet prepared by the *National Automobile Dealers Association* and American Truck Dealers Division of the National Automobile Dealers Association. This pamphlet was entitled *Automobile and Truck Dealers Guide to the Federal Wage-Hour Law.* One section of the pamphlet provided in part:

> Salesmen are normally employed on a commission basis. They should be placed on a compensation basis that calls for the computation of their total earnings each two, three or four weeks with a guarantee of the applicable minimum wage for each hour they work in any workweek.
>
> \* \* \* \* \* \*
>
> Since the recapture of wages above referred to is not permitted, a dealer would be wise not to settle with his salesmen weekly. The law does not require payment of the minimum wage at any specific time. That being the case, the dealer should simply *advance*

certain sums to his salesmen weekly and then *settle with them as to their commissions on a* two-week, three-week or four-week basis.

*Record,* Plaintiff's Exhibit 4 at 8.

**8.** The Wage and Hour Field Operations Handbook has recently been amended. The portion quoted has been deleted. The amended version of the section, though not relevant in this case, essentially directs the reader to the regulations that address commission payments.

**9.** This over simplified illustration reflects only the essentials of a settlement period. It does not reflect the problems inherent in a 30 day or monthly type settlement plan. The over-time section of the statute requires extra pay for hours worked in excess of 40 hours per week. For this reason most employees must keep weekly time records. The N.A.D.A. (see note 7)

Assuming the minimum wage was four dollars per hour, the employer would be in compliance with the Act.

"Ordinarily, the relevant pay period is determined from the *actual pattern of payments* adopted by the parties." *Luther v. Wilson,* 528 F.Supp. 1166, 1173–74 (S.D.Ohio 1981) (emphasis added). However, the task of the court becomes more difficult where the employer has not produced adequate records that demonstrate: (1) the number of days within each settlement period; (2) the number of hours worked each week and within each period; (3) the wages paid to its employees within such period; and (4) that it has periodically settled with employees.

Although the regulations specify that "[n]o particular *order* or *form* of records is prescribed ...,"[10] the employer must, at a minimum, present records that will enable the court to make accurate calculations. *See Mitchell v. Mitchell Truck Line, Inc.,* 286 F.2d 721, 726 (5th Cir.1961) (where the employer's records are inadequate the " 'solution ... is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work.' "). In addition, the employer's records should include the general requirements set forth in the regulations.[11]

In this case, Superior has not presented evidence that it had a periodic pay and settlement period. Although Superior's records reflect weekly payments that were made to Olson and certain settlement dates, the records demonstrate that Superior's settlement periods were inconsistent and difficult to identify. Assuming the pay plan included weekly checks with a settlement each month, Superior's records reflect that settlements occurred on a sporadic basis. Moreover, if this method of compensation was used during the 17 month period in question, Superior would be expected to have at least 15 to 16 settlement periods. Here, Superior has only produced approximately nine instances in which settlement checks were issued to Olson. On the otherhand, if Superior utilized a weekly pay plan, the records demonstrate that the interval between payments was not uniform. Although the regulations do not require an employer to pay its employees on a specific date, we stress that it is more difficult for the employer to demonstrate the duration of its pay period if it does not utilize a periodic payment plan.

A review of the facts convinces us that Superior did not meet its burden. As the Supreme Court stated in *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946):

recommends that dealers use settlement periods of two, three or four weeks. It is common knowledge that most workers who earn wages near the minimum wage are paid on a weekly or two-week settlement period. This avoids the mathematical complexity of trying to fit weekly work time records into monthly settlement pay periods. *Superior's records simply do not overcome this obstacle.* The 26 pay settlement periods prevalent in this country were adopted to simplify accounting and to avoid maintenance of separate records for work periods and pay periods.

**10.** 29 C.F.R. § 516.1(a) (1984).

**11.** Section 516.2 of the Code of Federal Regulations provides in part:

 Every employer shall maintain and preserve payroll or other records containing the following information and data with respect to each and every employee ...:

  ....

(5) Time of day and day of week on which the employee's workweek begins.... If, however, any employee ... has a workweek beginning and ending at a different time, a separate notation shall then be kept for that employee or group of employees.

  ....

(7) Hours worked each workday and total hours worked each workweek....
(8) Total daily or weekly straight-time earnings or wages, ...
(9) Total overtime excess compensation for the workweek, ...
(10) Total additions to or deductions from wages *paid each pay period*....
(11) Total wages *paid each pay period,*
(12) Date of payment and the *pay period covered by payment.*
29 C.F.R. § 516.2(a) (1984) (emphasis added).

An employee who brings suit under § 16(b) of the Act for unpaid minimum wages or unpaid overtime compensation, together with liquidated damages, has the burden of proving that he performed work for which he was not properly compensated. The remedial nature of this statute and the great public policy which it embodies, however, militate against making that burden an impossible hurdle for the employee. *Due regard must be given to the fact that it is the employer who has the duty under § 11(c) of the Act to keep proper records of wages, hours and other conditions and practices of employment and who is in position to know and to produce the most probative facts* concerning the nature and amount of work performed....

When the employer has kept proper and accurate records the employee may easily discharge his burden by securing the production of those records. But *where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes a more difficult problem arises.* The solution, however, is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work. Such a result would place a premium on an employer's failure to keep proper records in conformity with his statutory duty; it would allow the employer to keep the benefits of an employee's labors without paying due compensation as contemplated by the Fair Labor Standards Act. In such a situation we hold that *an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence.* If the employer fails to produce such

evidence, the court may then award damages to the employee, even though the result be only approximate.

328 U.S. at 687–88; 66 S.Ct. at 1192 (emphasis added).

■ We think the rational of *Mt. Clemens* should be extended to this case. Thus, we hold that Superior did not meet its burden of producing sufficient records to demonstrate the duration of its pay or settlement period.

Because Superior did not meet its burden of proving its pay and settlement period, an approximate period must be determined by the district court on remand.

II. *Whether Excess Commissions Can be Carried Forward and Applied to the Minimum Wage on the Next Settlement Date*

As mentioned previously the district court found *excess* commissions could be *carried forward* and applied to the minimum wage on the *next settlement date.* The district court relied on the Wage and Hour Field Operations Handbook in reaching his conclusion. However, the Handbook also provided that "[t]he only requirement is that the employee receive 'prompt payment' of the minimum wage covering all hours worked during the pay period." *See Record,* Plaintiff's Exhibit 2 at 2. As mentioned previously, the Handbook no longer contains the example upon which the district court and the parties rely.

■ We think the Act clearly requires an employee to be *paid* the minimum wage for each hour worked during the pay period. *See Mitchell v. Mitchell Truck Line, Inc.,* 280 F.2d 721, 741 (5th Cir.1961) (The Act requires an employer to pay minimum wages.). Although the provision cited by the district court allows excess commissions to be carried forward, the Handbook provision must be interpreted in light of the Act's history and purpose. One of the purposes of the Act was to ensure that employees would receive the minimum wage for each hour worked within a pay period. *See Barrentine v. Arkansas-Best Freight System, Inc.,* 450 U.S. 728, 739,

101 S.Ct. 1437, 1444, 67 L.Ed.2d 641 (1981) ("[T]he FLSA was designed to give specific minimum protections to *individual* workers and to ensure that *each* employee covered by the Act would receive '[a] fair day's pay for a fair day's work' and would be protected from the evil of 'overwork' as well as 'underpay.' "). Thus, a fair interpretation of the Handbook provision is that excess commissions earned by salesmen during one pay period may be carried forward and applied to the minimum wage for the next period so long as the employee actually received the minimum wage for each hour worked within each separate pay period. This places a duty on the employer to ensure that the employee *receives* payment of the minimum wage. A mere alteration of the employer's records that reflects excess commissions earned in the preceding period being applied toward the minimum wage for the current period will not suffice. The employee must *actually receive* the minimum wage each pay period.

On remand, the district court should determine whether Olson was *paid* the minimum wage for each hour worked during each pay period, keeping in mind excess commissions could be carried forward in order to satisfy the minimum wage only if they were paid to Olson in the next pay period.

### III. *Good Faith Defense*

Although the district court found that Olson was not paid the minimum wage for November, 1981, it held Superior Pontiac was not subject to liability for its failure to pay the minimum wages in November, 1981 because of the good faith defense found in 29 U.S.C. § 259.

Olson argues that the district court erred because it applied a subjective test—that is—it allowed Superior to be exonerated by the good faith test because it merely *attempted* to comply with the regulations.

Olson contends that the statute requires an objective test to be applied. The district court stated:

> In a good faith application of the Handbook, defendant believed that plaintiff had been compensated in accordance with the Handbook's interpretation of the minimum wage law as applied to automobile salesmen. Plaintiff has not presented any proof that defendant was not acting in good faith in relying on the Handbook amendment.

*Dist. Ct. Op.* at 6. The district court found that the handbook was an interpretation of an agency of the United States and could be relied upon to establish the good faith defense. *Id.*

Under the Portal to Portal Pay Act, 29 U.S.C. § 260, a court may in its sound discretion refuse to award liquidated damages if the employer shows that the act or omission giving rise to the action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act. The employer must plead and prove that the act or omission complained of was: (1) in good faith; (2) in conformity with; and (3) in reliance on an administrative regulation, order, ruling, approval or interpretation of an agency of the United States. *See* Portal to Portal Pay Act, 29 U.S.C. § 258, 260.[12]

■■■ The legislative history of the Portal to Portal Pay Act indicates that "good faith is intended to apply only where an employer innocently and to his detriment, followed the law as it was laid down to him by government agencies, without notice that such interpretations were claimed to be erroneous or invalid." *Clifton D. Mayhew, Inc. v. Wirtz*, 413 F.2d 658, 661 (4th Cir.1969). Under the Act, "[t]he employer must meet an *objective test* of actual con-

---

**12.** The regulations interpreting the Portal to Portal Act also indicate three requirements must be met in order for the good faith defense to apply. The regulations provide:

> In all cases, ... the act or omission complained of must be both "in conformity with" and "in reliance on" the administrative regula-

tion, order, ruling, approval, interpretation, practice, or enforcement policy, as the case may be, and such conformance and reliance and such act or omission must be "in good faith".

*See* 29 C.F.R. § 790.13.

formity with an administrative ruling or policy." *Id.* at 661. In addition:

[C]ourts should be hesitant to impose retroactive minimum wage liability on employers in the face of an administrative interpretation which the employer could plausibly interpret as insulating him from liability. [I]n close cases [courts] should consider the expectations of the contracting parties and the reasonableness of the employer's actions in light of the administrative interpretation in question.

*Marshall v. Baptist Hospital, Inc.*, 668 F.2d 234, 238 (6th Cir.1981). The "test of an employer's good faith in relying on an administrative order or regulation is 'whether he acted as a reasonably prudent man would have acted under similar circumstances.'" *Beebe v. United States*, 640 F.2d 1283, 1293 (Ct.Cl.1981).

▮ The primary reason the good faith defense is not available to Superior is because it did not act in *conformity* with the administrative interpretation.

The "good faith" defense is not available to an employer unless the acts or omission complained of "were in conformity with" the regulation.... This is true even though the employer erroneously believes he conformed with it and in good faith relied upon it; *actual* conformity is necessary.

29 C.F.R. § 790.14 (1984). The district court specifically found that the person responsible for the salesmen's pay plan incorrectly interpreted the amendment to the handbook. Obviously, Superior did not act in conformity with the handbook provision and cannot avail itself of the good faith defense.

▮ Additionally, Superior did not act in good faith. As stated earlier, good faith is determined by ascertaining whether the person acted as a reasonably prudent man would have acted under similar circumstances. The district court found that Superior's management gave differing interpretations to the amendment of the handbook. The district court concluded that the

assistant comptroller "believed excess commissions would be carried forward while [the president] thought deficiencies should be carried forward." *Id.*

The regulations provide that good faith requires the employer to have honesty of intention and to be without knowledge of circumstances which ought to put him upon inquiry. 29 C.F.R. § 790.15 (1984). In this case, the president of a company and one of its top administrators had differing interpretations of a provision which they contend was applied in good faith. If such differing interpretations existed, a prudent person would have sought professional advice. There is no evidence that such advice was sought or ascertained in this instance.[13] "The legislative history of the Portal Act makes it clear that the employer's 'good faith' is not to be determined merely from the actual state of his mind." *Id.*

Although the defendants might have had good faith in their minds, their actions did not evidence it. Superior did not act as a prudent person; thus, it cannot claim that its actions were taken in "good faith". Because Superior did not act in good faith and in conformity with the handbook provision, we hold that it is not entitled to the good faith defense.

## IV. *Conclusion*

The Fair Labor Standards Act was enacted for the purpose of protecting workers from substandard wages and oppressive working hours. In this case, Superior has not carried the burden of producing sufficient evidence that reflects it had established a fixed period of time in which it kept accurate records of the number of hours worked and the amounts of compensation paid, at the end of which it settled its account with each employee in a manner that permitted mathematical calculation of average hourly wage payments during that period.

Requiring automobile dealers to pay their commissioned salesmen the minimum wage will not destroy the commission sales

---

13. Superior argues that its president and comptroller were not legally trained and attempted to apply the amendments to the best of their ability. This argument does not have merit.

system. It will merely require the employers to maintain adequate records to ensure that their salespersons are receiving at least the minimum wage for each hour worked during the relevant pay period. The automobile industry itself as well as the labor department have provided dealers with guidelines to assist them with this task. To allow Superior to escape liability by availing itself of the good faith defense, when it has not exercised good faith or acted in conformity with administrative regulations, would run afoul of the goals of the Fair Labor Standards Act.

Accordingly, we reverse and remand to the district court for further proceedings in accordance with this opinion.

REVERSED and REMANDED.

HATCHETT, Circuit Judge, concurring in part and dissenting in part.

The principal issues in this case are factual. The first is whether the evidence presented in a bench trial showed that the salesman's salary was paid weekly. The district judge heard the evidence and found that the salesman was paid monthly. The district court found:

> The plaintiff [Olson] relied on conclusions argued from the record as to the operation of the pay plan to attempt to establish that the payment period was weekly. Absent plaintiff's [Olson] testimony, the record equally supports the defendant's testimony that the pay plan was monthly. The plaintiff has not met his burden of proof.

The law of this circuit dictates that we review that factual finding under the clearly erroneous rule. *Morgado v. Birmingham-Jefferson County Civil Defense Corps,* 706 F.2d 1184 (11th Cir.1983); rule 52(a) Fed.R.Civ.P.

The second principal issue is whether the district court was correct in finding that the appellee, Superior Pontiac-GMC, Inc., acted in good faith in relying upon the Wage and Hour Field Operations Handbook, regarding the carrying forward of excess commissions into subsequent settlement periods. The district court found:

> In a good faith application of the handbook, the defendant [Superior Pontiac-GMC, Inc.] believed that plaintiff [Olson] had been compensated in accordance with the handbook's interpretation of the minimum wage laws as applied to automobile salesmen. Plaintiff [Olson] has not presented any proof that defendant was not acting in good faith in relying on the handbook amendment.

The majority recites interesting principles of law with which I generally agree. The appellant lost the case for failure to present evidence to support his allegations; he did not lose the case due to misapplied rules of law. I would affirm the district court.